(No. 92-CC-0835—)

IDA R. CHEPAN and EDWIN WILLIAM CHEPAN, Claimants, *v.* THE STATE OF ILLINOIS, Respondent.

*Order filed December 18, 1998.*

GILBERT, KIMMEL, HUFFMAN & PROSSER, LTD. (DON E. PROSSER, of counsel), for Claimants.

JIM RYAN, Attorney General (MICHAEL A. WULF, Assistant Attorney General, of counsel), for Respondent.

## ORDER

MITCHELL, J.

This is a trip and fall sidewalk case that occurred at the Rend Lake Rest Stop on I-57. The Claimant and her

husband had stopped at the rest stop and the Claimant came to a section of sidewalk, which was allegedly uneven by "in excess of an inch," and as a consequence of the unevenness in the sidewalk, the Claimant stumbled, fell and was severely injured. The weather was nice and it was a beautiful day. The Claimant and her husband were walking slowly because it was a nice day. Claimant's husband testified that Claimant's feet caught on the cement unevenness and she fell. Except for the markings and the barricade, Chepan exhibit no. 11, picture 15, shows the condition of the sidewalk on the day of the accident. The Claimant was wearing flat bottom tennis shoes.

After Claimant fell, she received first aid from Respondent's representatives at the site of the rest stop, and then her husband took her to the Franklin County Hospital in Benton where she was treated. She was x-rayed and her wound was "sewed up." Claimant's eyeglasses were broken in the fall. Upon Claimant's return to Pensacola, Florida, she went to her family doctor who ultimately removed her stitches. Claimant continued to attend at the offices of her family physician in Pensacola because she had pains in the upper part of her body and the doctor was prescribing muscle relaxants and pain killers. Ultimately, the Claimant saw an orthopedic doctor named Zorn, who ultimately performed surgery on Claimant's rotator cuff. Claimant was in the hospital two or three days followed by bed rest at home for quite a while. Mrs. Chepan underwent physical therapy and attended at the office of her dentist because she kept having headaches. Also, she had problems chewing. Claimant's dentist diagnosed that she had TMJ and sent her to a specialist named Greskovich. Claimant was prescribed an orthodontic splint that was like a mouth guard. Bills for the Claimant's medical treatment identified as Chepan exhibit nos. 1 through 9 were admitted.

Claimant's husband testified that exhibit no. 11, picture 15, accurately portrays the elevation of the concrete slab edge that allegedly caused, or contributed to cause, Claimant's injury. Claimant's husband testified that the slab of concrete was off-set "an inch or an inch and a quarter." On cross-examination, Claimant's husband testified in answer to whether he measured the protruding edge of the concrete slab. He stated, "I just stuck my finger down beside it. My finger is an inch long, my joint." On further cross-examination, Claimant's husband said in accordance with the complaint of the Claimant that, "it could have been three quarters [of an inch], but I'm saying I pushed my finger down in there and it came up to the first joint." Claimant's husband testified that he measured with his finger by the number "1" which is seen on photo no. 2.

Claimant testified that she did not see the difference in elevation of the two slabs of concrete. Claimant testified that the pain from her lacerated chin was excruciating. She also had pain in her shoulder that was "just bad, real bad." When Claimant returned to Florida, she saw her family doctor, Dr. Nass. Claimant saw Dr. Nass on November 13th and he examined her and sent her to the hospital for x-rays for her knee, her shoulder and her neck. Claimant remembered that the stitches were removed on November 13th. Claimant went to her dentist, Dr. Kates, who referred her to Dr. Greskovich, who was a specialist, to treat Claimant's headaches. Greskovich prescribed a splint that was like a mouth guard. Claimant also saw Dr. Zorn for her shoulder. Zorn was an orthopedic specialist. Zorn gave Claimant injections and ultimately recommended surgery to repair a torn rotator cuff. Claimant recalls that she was hospitalized from the surgery four days and had follow-up visits with Dr. Zorn thereafter. Zorn recommended that she have physical therapy. Claimant stated that her arm was painful for a long time after

the surgery and was still painful at the time of the hearing. Thereafter, Zorn referred Claimant to Dr. Timmons who was a pain management physician. Timmons put her to sleep on multiple occasions and gave her some type of injections in the shoulder and back. Timmons also recommended that Claimant wear a belt that gives her support. After receiving the shots from Timmons, Claimant experienced "a great change." Claimant contends that her life has changed, in that she cannot vacuum or lift cooking utensils. Claimant testifies that it hurts her to lift laundry out of the washer and put it in the dryer, and that she now has to ask her husband to do household activities which she did not have to do prior to the accident. Claimant contends that she can no longer do yard work, and that she is not independent like she used to be and cannot do the things that she has previously done.

On cross-examination, Claimant indicated that she was paying close attention when she was walking because of her condition of nearsightedness. On cross-examination, Claimant repeatedly stated that she fell at a location shown on the left side of photograph no. 2 on Claimant's exhibit no. 11.

Respondent admitted that another person fell at the same location where the Claimant fell on the same date (November 4, 1989). Apparently, the individual fell after Claimant fell. Judicial notice was taken of the "Illinois Accessibility Code" being a published report of the Capital Development Board appearing in 71 Illinois Administrative Code which restricts deviation from level surface on sidewalks for handicapped accessibility to one-half inch or less. (See Chepan exhibit no. 12.)

The total of Mrs. Chepan's medical expenses revealed in Claimant's exhibit nos. 1 through 9 was $5,764.33.

The parties waived the filing of briefs.

Not every fall on a walkway under the care of the Respondent will support a recovery. In *Heimann v. State* (1977), 32 Ill. Ct. Cl. 111, Claimant brought suit against the State of Illinois for broken bones sustained by her in a fall on a pedestrian walkway of the Respondent. Claimant contended that Respondent permitted a tunnel-like depression to exist across the entire width of the walkway and failed to warn pedestrians of its existence, or to properly illuminate the area. Claimant contended that a depression "perhaps two inches deep, and maybe six inches wide, and then the width of the whole walk * * *," caused her to fall and sustain serious injuries. This Court held that the State of Illinois is not an insurer of the safety of persons on and upon walkways owned and maintained by the Respondent, and that Claimant bore the burden of establishing, by a preponderance of the evidence, that Respondent breached a duty of care toward the Claimant, and that the breach proximately caused the Claimant's injuries. In the *Heimann* case, *supra*, Claimant's claim was denied by this Court based on a lack of evidence to show that Respondent had actual or constructive notice of the existence of the alleged defect. (32 Ill. Ct. Cl. 111, 113.) This Court noted that the Claimant in the *Heimann* case offered no evidence to prove the time that the defect in the walkway existed, and from the photographs in evidence, the Court determined that the defect was not of such an obvious character as to put the State on notice of its existence. 32 Ill. Ct. Cl. 111, 113.

In *Nolan v. State* (1983), 36 Ill. Ct. Cl. 194, this Court denied a recovery in a sidewalk trip and fall case occasioned when the Claimant tripped over a handicap ramp on a patio or porch in a dark area at the Stratten Office Building. In that case, this Court reiterated that the Claimant must prove the State had actual notice of a defect in

the sidewalk or constructive notice and that in the absence of proof of a dangerous condition or that the State had knowledge or should have known of the dangerous condition, there could be no recovery. The Court noted there had been no previous accidents involving the ramp even though it had been in existence for a number of years. 36 Ill. Ct. Cl. 194, 199-200.

In *Simpson v. State* (1985), 37 Ill. Ct. Cl. 76, this Court denied a claim from a walkway trip and fall case originating at New Salem State Park. In that case, Claimant was walking on an asphalt pathway that was not level with adjacent terrain, but had a drop-off of one to one and one-half inches along its border. Claimant stepped off the asphalt without looking and slipped and fell, breaking bones in her right foot. (37 Ill. Ct. Cl. 76, 77.) This Court, in an opinion authored by Justice Roe, noted that the State knew of the condition of the pathway, but that the issue was whether the condition was unreasonably dangerous so as to give rise to an obligation on the part of the State to warn of the condition or otherwise protect the public using the pathway. This Court recited that the drop-off was less than two inches, and that the general rule in such an instance has been clearly stated to be that while "minor" defects in a walkway are not actionable, it is within the purview of the trier of fact to determine negligence when the defect is such that a reasonably prudent man should anticipate some danger to persons walking upon the walkway, and that the problem was in defining what is a "minor" defect. In that case, the Court concluded from the photographs that any defect that existed was not so unreasonably dangerous as to create liability against the State. The condition shown was not found to be unacceptable or unreasonable; it should, however, be noted that this Court opined that there was no breaking in the pavement itself, but rather the ground

along side the walkway was lower in some places than the walkway surface. 37 Ill. Ct. Cl. 76, 79.

In *White v. State* (1984), 38 Ill. Ct. Cl. 1, the Claimant maintained that a sidewalk had been constructed and maintained in a negligent manner so as to cause an unnatural accumulation of ice. Claimant contended that there was a slope in the sidewalk of 12½ percent causing an unnatural accumulation of ice. The evidence indicated that the slope of the 12-foot-wide sidewalk was from an elevation of 15 feet to 13 feet, 6 inches from edge to edge, involving a drop of 1½ feet over a space of 12 feet. This Court, among other things, looked to the Illinois Supreme Court opinion in *Arvidson v. City of Elmhurst* (1957), 11 Ill. 2d 601, 145 N.E.2d 105. The Illinois Supreme Court set forth in clear language the rule of law applicable to a situation where a person falls on a defective sidewalk. One of the basic questions in determining liability is whether the sidewalk irregularity is too slight to impose a duty to remedy the defect. The Court stated:

"While courts are in marked disagreement as to when the sidewalk irregularity or defect is so slight that the question is one of law, and where it is one of fact for the jury; nevertheless, the decisions recognize that no mathematical standard can be adopted in fixing the line of demarcation, and that each case must be determined upon its own particular facts and circumstances."

In denying the claim, this Court stated:

"* * * we suspect that the testimony of the various witnesses with respect to the depressions or holes in the walk is contradictory only in degree. What we believe to be likely is that, whereas the sidewalk was obviously not as smooth as a dance floor, it was also not dangerously defective." See 38 Ill. Ct. Cl. 1, 6.

In *Gillmore v. State* (1986), 40 Ill. Ct. Cl. 85, this Court denied recovery on a sidewalk fall where Justice Patchett recited in his opinion that the gap or unevenness of the concrete was only one inch to one inch and a half, and stated as follows:

"The Claimant simply failed to prove that the sidewalk was defective, and has further failed to prove by a preponderance of the evidence that the sidewalk was the actual cause of the injury."

In the *Gillmore* case, this Court had available photographs admitted in evidence just as we have in the case at bar. (See Claimant's exhibit no. 11.)

In *Moore v. State* (1991), 43 Ill. Ct. Cl. 204, this Court made an award for an injury caused by a manhole cover that was depressed below the surface of the concrete sidewalk two and one-half inches, finding that such a step down in a pedestrian walkway could be an unsafe condition and the State had notice of it. (See 43 Ill. Ct. Cl. 204, 206.) Allowing an award in that case, this Court found the Claimant to be guilty of 50% comparative fault.

A careful examination of the photographs and molding of the alleged defect in this case leads the Court to the conclusion that the difference in level in the two adjacent slabs of concrete in this case is of a deviance between one-half inch and three quarters of an inch.

Therefore, the claim is denied for the reason that there is no support in the reported decisions of this Court calling to extend the responsibility of the State to such a high degree of precision in avoiding deviations from level on public walkways. A deviation of the type involved in this case is too minor to be considered a "dangerous condition." It does not seem unreasonable to expect persons making use of public walkways to anticipate the possibility of a one-half inch deviation from absolutely flat.